**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
ASHLAND DIVISION**

IN RE:

JAMES ALBERT THOMAS and                                                                CASE NO. 13-10043
REBECCA MARIE THOMAS                                                                   CHAPTER 13

DEBTORS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the following: Notice and Opportunity for Hearing and Objection to Claim [Doc. 25], Response by Creditor Jennifer Clark to Objection to Claim [Doc. 34], Joint Stipulations of Fact by Debtors James Thomas and Rebecca Thomas and Creditor Jennifer Clark [Doc. 47], Trial Brief of Creditor Jennifer Clark [Doc. 48] and Trial Brief Of Debtors [Doc. 53]. The Court has jurisdiction pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) and (L). Venue is proper pursuant to 28 U.S.C. § 1409.

**I.     BACKGROUND AND FACTS**

     **A.     The First Marriage.**

The co-debtor, James Thomas (the "Debtor", and with his current wife and co-debtor Rebecca Thomas, the "Debtors") and the creditor, Jennifer Clark (f/k/a Jennifer Thomas) (the "Creditor"), were originally married on August 4, 1995. They had two children together, H.D. (born in 1997), and T.K. (born in 2000). The Debtor and Creditor purchased a family home on July 12, 1999, located at 95 Township Road, 1215, Ironton, Ohio (the "Property"), using a loan secured by a first mortgage on the Property (the "First Mortgage"). On April 28, 2001, the couple obtained a loan in the amount of $15,463.79 secured by a second mortgage on the Property (the "Second Mortgage").

On May 13, 2003, the parties separated and entered into an agreement pertaining to child custody, division of property and child support (the "2003 Settlement Agreement"). [Doc. 52, Ex. C] On June 25, 2003, the couple divorced pursuant to a Decree of Dissolution in the Court of Common Pleas, Lawrence Co., Ohio, Domestic Relations Division (Case No. 03-DR-391) (the "2003 Consent Decree"). [Doc. 52, Ex. C] The 2003 Settlement Agreement was incorporated in the 2003 Consent Decree, so all future references are to the 2003 Consent Decree.

Specifically, the Debtor agreed to relinquish any interest in the Property and the Creditor agreed to assume and hold Debtor harmless from the obligation to pay the First Mortgage and Second Mortgage. The Debtor likewise agreed to pay child support in the amount of $510.00 per month, despite a child-support calculation that would have required just $415.23 per month. The 2003 Consent Decree specified that "[t]he deviation [in child support] is in the best interests of the children as the Wife is paying both mortgages on the marital property." Doc. 52 at p. 21. Further, the parties agreed that neither of them would pay spousal support to the other.

    **B.**    **The Second Marriage.**

The couple remarried on April 30, 2004, and divorced again by order dated April 18, 2007, entered by the Court of Common Pleas, Lawrence Co. Ohio (Case No. 06-DR-42) (the "2007 Divorce Proceeding"). Like their first separation, the Debtor and Creditor reached an agreement for the "distribution of assets, payment of debts, and other matters" that was memorialized in the April 18, 2007 Order (the "2007 Consent Decree"). The 2007 Consent Decree provided that the agreement was "in all respects fair, just and equitable" and adopted and

approved the terms. The Debtor and Creditor were each represented by counsel who signed off on the 2007 Consent Decree.[1]

Though the terms of the 2007 Consent Decree were similar to the parties' 2003 Consent Decree, the agreements differed in some respects. As in the 2003 Consent Decree, neither spouse was obligated to provide spousal-support payments in the 2007 Consent Decree. The Creditor received primary custody of the children; however, the Debtor's child-support obligation was just $369.15 per month.

The Debtor again agreed to give up any interest in the Property in the 2007 Consent Decree because he had never conveyed the Property as required by the 2003 Consent Decree. The Creditor agreed to assume and hold the Debtor harmless on the First Mortgage loan in the 2007 Consent Decree. The Debtor and Creditor agreed to split the Second Mortgage obligation. Specifically, Section 4 of the 2007 Consent Decree provides:

> That [Creditor] shall receive the marital residence, free and clear of any and all claims on behalf of [Debtor], and she shall assume and be responsible for the first mortgage, saving [Debtor] harmless thereon, and the parties shall equally pay the second mortgage. After the sale of the real estate, any deficiency on the mortgage indebtedness shall be divided between the parties. Should there be a net balance after the sale, these proceeds shall be the sole property of [Creditor].

Doc. 47-1 at p. 3. Consistent with the 2007 Consent Decree, the Debtor quitclaimed his interest in the Property to the Creditor by Deed dated April 4, 2007, and recorded May 31, 2007. [Doc. 52, Ex. J]

### C.    The Judgment Lien.

On November 18, 2004, Auto Now Acceptance Co., LLC ("Auto Now") obtained a judgment against the Debtor in the amount of $8,082.37, plus interest and costs. On October 20, 2005, Auto Now filed a judgment lien against the Debtor in the Lawrence County property

---

[1] Creditor was represented by counsel and Debtor acted pro se in negotiation of the 2003 Consent Decree.

records (the "Judgment Lien"). [Doc. 52, Ex. H] The Judgment Lien was not addressed in the 2007 Consent Decree even though it attached to the Property. The Creditor testified that she was not aware of the Judgment Lien till she offered the Property for sale. *See* Doc. 49, ¶ 6. Although the Debtor's affidavit addresses the circumstances preceding imposition of the Judgment Lien, the record does not disclose whether the Debtor knew the Judgment Lien had attached to the Property at the time of the 2007 Divorce Proceeding.

        D.      **The Property Sale and 2009 Order.**

The Creditor sold the Property to third-party buyers on September 18, 2008. *Id.* Proceeds from the sale were used to satisfy the First Mortgage and Second Mortgage debts of $66,095.64 and $15,000.00, respectively. *See* Doc. 50-2, Ex. D. The Creditor also negotiated release of the Judgment Lien for $5,000.00, which was paid from the sales proceeds.[2] *See* Doc. 49, ¶ 6. After the assessment of all taxes and fees, the Creditor paid $836.14 to close the transaction. *See* Doc. 50-2, Ex. D.

Payment of the Second Mortgage debt and the Judgment Lien were the subject of additional legal action. A January 15, 2009 order entered in the 2007 Divorce Proceeding provided in part (the "2009 Order"):

    2.    Defendant [Debtor] shall reimburse the Plaintiff [Creditor] $7,500.00 for his interest in the secondary mortgage. [Referred to herein as the "Second Mortgage Debt".]

    3.    Defendant shall reimburse the Plaintiff $5,000.00 for monies paid by her for paying off a judgment lien of his. [Referred to herein as the "Judgment Lien Debt".]

[Doc. 47-1 at p. 10]

---

[2] Auto Now's "2004 Deficiency Balance" is listed as an unsecured claim on Schedule F in the amount of $18,000.

4

**E.    The Disputed Claim.**

The Debtors listed two obligations to the Creditor on their schedules. The first was a $560.00 unsecured priority claim for child support on Schedule E, which is not disputed. The other was a $15,000.00 unsecured claim on Schedule F described only as "Debt." The Creditor filed Proof of Claim no. 6-1 asserting a priority unsecured claim for "[a]limony, maintenance, or support" in the amount of $12,500.00 for the Second Mortgage Debt and the Judgment Lien Debt (collectively, the "Disputed Claim"). The Debtors objected and maintain the Disputed Claim is not in the nature of alimony, maintenance, or support, but "is for a second mortgage debt and judgment lien on property that were satisfied when the real estate was sold by creditor previously," and is thus not a domestic support obligation.[3] *See* Doc. 25.

**F.    The Parties' Evidence.**

The Debtors and Creditor submitted their Joint Stipulation of Facts, acknowledging entry of the 2007 Consent Decree and 2009 Order and attaching copies of each. [Doc. 47] The parties each presented testimony by affidavit. [Doc. 49 – Affidavit of Jennifer Clark and Doc. 51 – Affidavit of James Thomas] No objections were raised and the Affidavits were admitted as the direct testimony of the witnesses. At the evidentiary hearing, both parties agreed to forego cross-examination, allowing the Affidavits to stand as the witnesses' only testimony.

In addition to their direct testimony, each party submitted an exhibit list and copies of relevant documentary evidence. [Doc. 50 – Exhibit List of Jennifer Clark and Doc. 52 – Witness and Exhibit List of James Albert Thomas] The exhibits of both parties were admitted without objection.

---

[3] The Debtors' proposed Plan at Part III.D. acknowledges the priority afforded domestic support obligations, providing that any such claim "shall be paid through the plan until the amount of the claim as set forth in the Creditor's proof of claim has been paid in full. [Doc. 22] The Chapter 13 Trustee's recommendation confirms that if the Disputed Claim is treated as a domestic support obligation, the proposed Plan is not confirmable. [Doc. 28]

## II. ANALYSIS.

The issue is whether the Disputed Claim qualifies as a Domestic Support Obligation under 11 U.S.C. § 101(14A) and therefore is entitled to priority under 11 U.S.C. § 507(a)(1)(A). The Creditor, as the party seeking a DSO for the purpose of priority status under § 507, bears the burden of proof by a preponderance of the evidence to show that her claim is entitled to priority. *See In re Clark*, 441 B.R. 752, 755 (Bankr. M.D. N.C. 2011); *In re Catron*, 164 B.R. 912, 916 (E.D. Va. 1994), *aff'd*, 43 F.3d 1465 (4th Cir. 1994).

### A. Treatment of Domestic Support Obligations in the Bankruptcy Code.

Section 507(a)(1) creates a first-priority claim for domestic support obligations. 11 U.S.C. § 507(a)(1). A "domestic support obligation" (hereafter, "DSO") is defined in 11 U.S.C. § 101(14A) and includes in subsection (B) claims "in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated …." The question in this case is whether the Disputed Claim is a debt "in the nature of alimony, maintenance, or support."

### B. Whether a Claim Is a DSO Is Based on the Parties' Intent Interpreted Under Federal Law.

#### 1. The *Calhoun* Four-Part Test Applies.

The Sixth Circuit in *Long v. Calhoun (In re Calhoun)*, 715 F.2d 1103, 1107 (6th Cir. 1983), established a four-part test to determine if a debt arising from a state-court divorce proceeding is in the nature of support, differentiating it from other unsecured claims. Though decided before the enactment of § 101(14A), the *Calhoun* analysis remains controlling because the fundamental question under both prior and current law is whether the debt is "in the nature of

alimony, maintenance, or support." *See Kassicieh v. Battisti (In re Kassicieh)*, 467 B.R. 445, 449-50 (Bankr. S.D. Ohio 2012), *affirmed* 482 B.R. 190 (B.A.P. 6th Cir. 2012).

The Sixth Circuit summarized its approach in *Fitzgerald v. Fitzgerald (In re Fitzgerald)*, 9 F.3d 517, 520 (6th Cir. 1993):

> In *Calhoun,* this Court provided an analytical framework for determining when obligations are "actually in the nature of alimony, maintenance, or support," and thus nondischargeable, when they are not designated as such. *Calhoun* involved a continuing obligation by a debtor to assume marital debts and hold harmless his former spouse. The *Calhoun* obligation was incurred as part of a divorce settlement. This Court first found that a hold harmless obligation could constitute nondischargeable support although not paid directly to the former spouse. Next, we announced a four-step analysis for determining whether an obligation, which was not designated alimony or maintenance, was nonetheless actually in the nature of support and nondischargeable. First, the obligation constitutes support only if the state court or parties intended to create a support obligation. Second, the obligation must have the actual effect of providing necessary support. Third, if the first two conditions are satisfied, the court must determine if the obligation is so excessive as to be unreasonable under traditional concepts of support. Fourth, if the amount is unreasonable, the obligation is dischargeable to the extent necessary to serve the purposes of federal bankruptcy law. 715 F.2d at 1109-10. The burden of demonstrating that an obligation is in the nature of support is on the non-debtor. 715 F.2d at 1111.

### 2. DSO Classification Is a Matter of Federal Law.

The Debtor argues the 2003 Consent Decree and the 2007 Consent Decree specifically exclude spousal support. *See* Doc. 51, ¶¶ 3, 5. Further, much of the Debtor's testimony refers to other agreements in the 2003 Consent Decree and argues their impact on the nature of the Disputed Claim. *See id.*, ¶¶ 4, 6, 16. Conversely, at the evidentiary hearing in this matter, the Creditor's attorney argued that the 2003 Consent Decree has no place in a review of the Disputed Claim, which arises out of the 2007 Divorce Proceeding. The following analysis will show the Debtor is correct; federal law applies so the review may expand beyond the terms of the 2007 Consent Decree. Ironically, however, this fact helps the Creditor more than the Debtor.

The Sixth Circuit in *Calhoun* determined that whether a debt is a DSO is determined by federal law. *Calhoun*, 715 F.2d at 1107 ("The issue of when an assumption of joint debts is 'in the nature of alimony, maintenance, or support' as opposed to a division of communal property is to be determined by federal bankruptcy law."). Another court provided: "[A] debt could be in the 'nature of support' under section 523(a)(5) even though it would not legally qualify as alimony or support under state law." *Gianakas v. Gianakas (In re Gianakas)*, 917 F.2d 759, 762 (3d Cir. 1990) (quoting *Yeates v. Yeates (In re Yeates)*, 807 F.2d 874, 878 (10th Cir. 1986)).

The effect is apparent in the evidence that is reviewed. The 2007 Consent Decree is effectively a contract between Debtor and Creditor to resolve their debts and establish the terms of their divorce. *See, e.g., Richardson v. Edwards (In re Richardson)*, 127 F.3d 97, 101 (D.C. Cir. 1997). Generally, when the issue is the meaning of contract terms, a trial court starts by review of the four corners of the agreement. *See Savedoff v. Access Group, Inc.*, 524 F.3d 754, 762-64 (6th Cir. 2008) (describing the Court's role in interpreting contractual language under Ohio law). If the relevant terms of the agreement are not ambiguous, the court must base its decision solely on the contract terms and may not consider extrinsic evidence. *Id.* at 763 ("Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract.") (quoting *City of St. Marys v. Auglaize Cty. Bd. Of Commrs.*, 875 N.E.2d 561, 566 (Ohio 2007)). "[U]ltimately the question for the lower court, when it interprets a consent decree incorporating a settlement agreement, is what a reasonable person in the position of the parties would have thought the language meant." *Richardson*, 127 F.3d at 101.

A court reviewing the characterization of a DSO under federal law may, or possibly must, look beyond the terms of the agreement that gave rise to the obligation. One court described the review as follows:

> Although alimony, support, maintenance and property settlements comprise the stock-in-trade of the domestic relations court, that court does not usually address the conflict between bankruptcy and domestic relations goals embodied in section 523(a)(5). That conflict stems from the necessity of balancing the debtor's right to a fresh start against the needs of the debtor's spouse or children for support. This means that the bankruptcy court must look at the circumstances reflected in the parties' settlement agreement or divorce decree; it cannot simply rely upon characterizations made by the parties in their agreement or the divorce court in its decree to achieve other ends.

*In re Cacolici*, 108 B.R. 578, 583 (Bankr. N.D. Ohio 1989); *see also Gianakas*, 917 F.2d at 762 ("[T]he court must examine the language and substance of the agreement in the context of surrounding circumstances, using extrinsic evidence if necessary.").

This does not mean state law is ignored. The Sixth Circuit emphasized that state law may provide a useful source of "guidance." *Calhoun*, 715 F.2d at 1108. What guidance state law provides is not always clear as courts look at different factors in reaching decisions on classification of DSOs. *Id.* (citations omitted). Bankruptcy courts have reviewed various factors state courts use to grant support to a spouse, some staying within their own state's laws and others considering the issue in general. *Id.* at 1108-09. *See, e.g., In re Batzek*, 314 B.R. 464, 467-468 (Bankr. M.D. Fla. 2004) (8 factors); *Gianakas*, 917 F.2d at 762, n. 1 (15 factors). *Calhoun* itself identifies the following factors used by bankruptcy courts to determine if a loan assumption by a debtor is undertaken in lieu of a regular support obligation rather than as a property settlement:

> [T]he nature of the obligations assumed (provision of daily necessities indicates support); the structure and language of the parties' agreement or the court's decree; whether other lump sum or periodic payments were also provided; length of the marriage; the existence of children from the marriage; relative earning powers of the parties; age, health and work skills of the parties; the adequacy of support absent the debt assumption; and evidence of negotiation or other understandings as to the intended purpose of the assumption.

715 F.2d at 1108 n.2.

9

### 3. The Analysis Requires Review Outside the Agreement.

Even if normal contract review principles applied, extrinsic evidence is required to determine the appropriate classification of the Disputed Claim. As described previously, the Disputed Claim is comprised of two distinct components: (1) the Second Mortgage Debt and (2) the Judgment Lien Debt. As in *Calhoun*, neither the 2007 Consent Decree nor the 2009 Order clearly characterizes the debts within the Disputed Claim as either support or property-settlement obligations. Therefore, this decision must rely on all available information.

## C. The Second Mortgage Debt Is a DSO.

### 1. The Intent Was to Create a Support Obligation.

The first prong of the *Calhoun* test is whether the parties and the state court intended to create a DSO. The 2007 Consent Decree at Section 4 gives the Property to the Creditor, who also assumed the First Mortgage debt. *See* Doc. 47-1 at p. 2. The Debtor and Creditor each agreed to "equally pay the second mortgage." *Id.* Nothing in Section 4 of the 2007 Consent Decree specifically affirms or denies the allocation of the house and related debt is in the nature of support, so additional analysis is required.

#### a. Support Is Inferred because the Second Mortgage Payments Protected the Children's Home.

Regular payment of the Second Mortgage was essential to protecting the former marital residence, which indicates the Debtor's agreement to pay half the Second Mortgage was a support obligation. *See, e.g., Gianakas*, 917 F.2d at 764 ("The great weight of authority holds that a spouse's assumption of mortgage debts which enable members of the family to remain in the marital residence is an obligation in the nature of support, maintenance or alimony."). The uncontradicted testimony of the Creditor is that the parties intended for her to maintain primary custody of the couple's minor children and to continue to reside at the Property after the divorce.

*See* Doc. 49, ¶ 3. Further, retaining the Property was considered important because it was next door to the Creditor's parents, who were expected to help with child care. *Id.*

      b. <u>The Lack of an Upward Deviation in Child Support Payments in the 2007 Agreement Indicates a Support Payment.</u>

The intention of support is even more apparent from a comparison of the terms of the consent decrees. In 2003, the Debtor agreed to an upward deviation in child support in consideration of the Creditor's assumption of both mortgage payments. The 2003 Consent Decree provides at page 4: "The deviation is in the best interests of the children as the Wife is paying both mortgages on the marital property."

In 2007, there was no upward deviation in child support payments. The Debtor's child support obligation in the 2007 Consent Decree, as agreed (p. 2) and ordered (p. 3), equaled the calculation on the Child Support Computation Summary Worksheet (the "2007 Child Support Worksheet") attached thereto (*i.e.,* there was no upward deviation). It is reasonable to infer that the Debtor's obligation to pay half the second mortgage obligation compensated for the lower child support payment. This conclusion is even more compelling considering the intent of both agreements that the spouse retain the Property to shelter the children. *See* Doc. 49, ¶ 3; *see also supra* at <u>Section II.C.1.a</u>.

      c. <u>The 2007 Consent Decree Contains Ambiguous Terms that Resolve in Favor of the Creditor.</u>

Two parts of Section 4 of the 2007 Consent Decree (set out at <u>Section I.B</u>) cause uncertainty and require analysis. The first is the parties' agreement that, "[a]fter the sale of the real estate, any deficiency on the mortgage indebtedness shall be divided between the parties." The sale of the Property was sufficient to pay off both mortgages, allowing an argument that the quoted language would let the Debtor off the hook for any additional contribution on the Second Mortgage. The 2009 Order clarifies that Section 4 was intended to require payment of one-half

11

the $15,000 Second Mortgage obligation by the Debtor, regardless of the effect of a sale. The Debtor's arguments do nothing to overcome the clear terms of the 2009 Order.

The other part of Section 4 that requires mention is the final sentence: "Should there be a net balance after the sale, these proceeds shall be the sole property of the [Creditor]." Therefore, under Section 4, any deficiency is split, but any gain goes solely to the Creditor. The issue is whether the open-ended nature of this provision diminishes or abrogates the intention of support that otherwise exists in Section 4.

One interpretation could assume that the potential for a significant recovery if property values increase means the term does not evidence support. Another interpretation reinforces a conclusion that directing any net gain to the Creditor supports the children's living arrangements by allowing the Creditor to leverage any equity into better lodging for the children. The latter inference fits these facts considering the conclusion in Section II.C.1.a *supra*.

> d. The Creditor's Hold Harmless Agreement in the 2003 Consent Decree Does Not Relieve the Debtor from his Obligation to Pay the Disputed Claim.

The Debtor argues that the Creditor's hold harmless agreement in the 2003 Consent Decree precludes an argument that he should pay the Second Mortgage Debt. This argument defies reason. The terms of the 2007 Consent Decree imposing liability for one-half the Second Mortgage Debt on the Debtor amended and superseded any unperformed portions of the 2003 Consent Decree, which were nullified by the parties' remarriage. *See Lockard v. Lockard*, 102 N.E.2d 747, 748 (Ohio Ct. Comm. Pl. 1951) (finding custody issues mooted by second marriage). Alternately, the 2007 Consent Decree evidences the Debtor's independent and new obligation to pay half the debt. Further, any doubt is removed by the imposition of the obligation on the Debtor by the 2009 Order.

      e.    The Agreements Do Not Show the Debtor Was Entitled to Spousal Support.

The Debtor points out that he was out of work at the time of the 2007 Consent Decree, suggesting that between the parties he had a better claim to spousal support. *See* Doc. 51, ¶ 7. Apparently, the Debtor wants an inference that the 2007 Consent Decree could not have intended support for the Creditor if he was the one entitled to support. The Debtor does not point to any law that supports this position. True or not, this fact did not appear to affect the intent of the parties in the 2007 Consent Decree.

The 2007 Child Support Worksheet calculated the Debtor's child support payment as if he was employed. *See* Doc. 47-1 at 9. Further, the state court indicated that a "seek work order shall issue." *Id.* at 3. Therefore, the terms of the 2007 Consent Decree indicate it was the parties' expectation that the Debtor would find employment and make contributions from his earnings. Therefore, the Debtor's possible right to support is not relevant to the classification of the Disputed Claim as a DSO.

It is also recognized that there is conflicting information regarding the Debtor's claim that the 2007 Consent Decree did not contemplate spousal support. The 2007 Child Support Worksheet does indicate there is no spousal support, but the terms of the state-court order provide otherwise. At page 4 of the 2007 Consent Decree, the two full paragraphs begin, respectively: "All child support and spousal support ordered by this order ..." and "All child support and spousal support under this order …." This language indicates the state court's understanding that something in the 2007 Consent Decree was in the nature of spousal support, notwithstanding the absence of any allocation on the 2007 Child Support Worksheet.[4]

---

[4] Sections 5 and 6 of the 2007 Consent Decree allocate two automobiles, one each to the Debtor and the Creditor. Sections 7 and 8 allocate personal property and retirement benefits. There is little doubt these were property

13

### 2. The Debtor's Payment of the Second Mortgage Provided Necessary Support.

The second step in the *Calhoun* analysis is whether the obligation has the effect of providing necessary support. The uncontradicted testimony of the Creditor is that her income was insufficient to cover both the First Mortgage and Second Mortgage payments. Doc. 49, ¶ 4. Without the Debtor's agreement to pay one-half the Second Mortgage payments, there was a strong risk the Debtor's children would not have a home.

No further evidence was elicited by the Debtor that might affect this conclusion. Therefore, this prong of the *Calhoun* test is satisfied.

### 3. The Support Amount is Reasonable.

The third and fourth steps described in *Calhoun* consider whether a support obligation is so excessive that all or part of the debt is unreasonable. The relatively small size of the Second Mortgage Debt (even when considered as a lump-sum payment) confirm the payment is not unreasonable.

### 4. The Second Mortgage Debt is a DSO.

All of the circumstances, including the intent of the parties reflected in their agreements, the function served by the Debtor's obligation on the Second Mortgage, the necessity of the Debtor's contribution, and the reasonableness of the obligation, justify a finding that the Second Mortgage Debt is a DSO. The Second Mortgage Debt is thus "in the nature of alimony, maintenance, or support," and is properly characterized as a DSO entitled to priority under § 507.

## D. The Judgment Lien Debt Is a DSO.

### 1. The Intent was to Create a Support Obligation.

The Judgment Lien Debt is found in the Reimbursement Agreement, but was not addressed in the 2007 Consent Decree. The 2009 Order provides: "[Debtor] shall reimburse the

---

settlements. Nothing else in the 2007 Consent Decree would seem to indicate a spousal support payment, other than the provisions of Section 4.

[Creditor] $5,000.00 for monies paid by her for paying off a judgment lien of his." Using the term "reimbursement" might suggest a simple repayment, rather than a support obligation. This situation is different than a mere repayment, however, because the Debtor had no choice but to pay the Judgment Lien Debt as a condition precedent to selling the Property.

As indicated above, the Creditor's right to recover any net gain was in the nature of support. Further, Section 4 also required transfer of the Property "free and clear of any and all claims on behalf of defendant." Therefore, any claim that affects the Debtor's recovery under Section 4 affects her right to a support payment. A judgment lien against the Property has that effect.

Based on the evidence of record, it appears that the Debtor, whether knowingly or not, withheld information regarding a Judgment Lien encumbering the Property. This action, and inaction, effectively eroded the support the Creditor negotiated in the Consent Decree. The rights in Item 4 of the 2007 Consent Decree are in the nature of a support obligation, so the Debtor should not benefit by a finding that the Judgment Lien Debt is a mere property-settlement obligation.

Any other result would not properly reflect the conclusions already made regarding the intent surrounding the disposition of the Property and related debt. *See supra* at Section II.C. Further, the ruling against the Debtor in the 2009 Order confirms that the Debtor's failure to pay the debt related to the Judgment Lien diminished the Creditor's recovery. Therefore, the Judgment Lien Debt satisfies the criteria for a DSO.

### 2. The Remaining *Calhoun* Prongs Are Satisfied.

The analysis of the remaining portions of the test in *Calhoun* is consistent with that for the Second Mortgage Debt. The Judgment Lien Debt is necessary for support for the reasons previously stated and the amount is reasonable.

15

### 3. The Judgment Lien Debt is a DSO.

Although the 2007 Consent Decree did not specifically address the Judgment Lien, it did assign any proceeds from the sale of the Property to the Creditor and, as discussed above, these proceeds are in the nature of support. The Debtor's sole responsibility for the Judgment Lien is resolved conclusively by the 2009 Order. The Judgment Lien Debt is necessarily a DSO because it prevented the Creditor and her children from receiving sales proceeds that were intended as support. The Judgment Lien Debt is thus "in the nature of alimony, maintenance, or support," and is properly characterized as a DSO.

### III. CONCLUSION

The Disputed Claim is a DSO since both the Judgment Lien Debt and the Second Mortgage Debt are "in the nature of alimony, maintenance, or support." The Debtor's Objection to said claim [Doc. 25] is therefore OVERRULED.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
*Gregory R. Schaaf*
**Bankruptcy Judge**
**Dated: Wednesday, October 02, 2013**
**(grs)**